**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| ROBERT MICHALSKI, Individually and On Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>WEBER INC., CHRISTOPHER SCHERZINGER, WILLIAM HORTON, MARLA KILPATRICK, KELLY D. RAINKO, ELLIOTT HILL, MARTIN MCCOURT, MELINDA R. RICH, JAMES C. STEPHEN, SUSAN T. CONGALTON, MAGESVARAN SURANJAN, GOLDMAN SACHS & CO. LLC, BOFA SECURITIES, INC., J.P. MORGAN SECURITIES LLC, BMO CAPITAL MARKETS CORP., CITIGROUP GLOBAL MARKETS INC., UBS SECURITIES LLC, WELLS FARGO SECURITIES, LLC, KEYBANC CAPITAL MARKETS INC., ACADEMY SECURITIES, INC. CABRERA CAPITAL MARKETS LLC, SIEBERT WILLIAMS SHANK & CO., LLC, TELSEY ADVISORY GROUP LLC, and BDT CAPITAL PARTNERS, LLC,<br><br>Defendants. | Case No. 1:22-cv-03966-EEB<br><br>**AMENDED CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS**<br><br>JURY TRIAL DEMANDED<br><br>Honorable Elaine E. Bucklo |

Court-appointed Lead Plaintiff, Mateusz Grudziaz ("Plaintiff"), individually and on behalf of all other persons similarly situated, by and through his attorneys, alleges the following based upon personal knowledge as to himself and his own acts, and upon information and belief as to all other matters based upon, *inter alia*, the investigation conducted by and through his attorneys, which included, without limitation, review and analysis of: (i) regulatory filings made by Weber Inc. ("Weber") with the United States Securities and Exchange Commission ("SEC"); (ii) other public statements issued by and disseminated by Weber, including wire and press releases, earning

1

call transcripts and presentations, and media reports; (iii) reports issued by securities and financial analysts, news articles and other commentary and analysis concerning Weber and the industry in which it operates; and (iv) other publicly available information concerning Weber.

Plaintiff's investigation into the matters alleged herein is ongoing, and many relevant facts are known only to, or are exclusively within, the custody or control of the Defendants. Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I.    __INTRODUCTION__

1.    Plaintiff brings this class action lawsuit on behalf of all persons and entities who purchased Weber's Class A common stock pursuant and/or traceable to the registration statement and prospectus issued in connection with Weber's initial public offering on or around August 6, 2021 (the "IPO"). Plaintiff asserts violations of Sections 11 and 15 of the Securities Act of 1933 (the "Securities Act") (15 U.S.C. §§ 77k and 77o) against Weber and certain of its current and/or former senior executives, directors, and underwriters.

2.    When Congress enacted the federal securities laws, it sought to do away with the traditional buyer-beware (*caveat emptor*) approach and replace it with an affirmative duty on corporate issuers to disclose all material information fully and fairly when selling securities to the general public. This marked a paradigm shift in the securities markets that our federal courts have faithfully enforced for the better part of the past century. This case presents a textbook example of a company that failed to abide by these underlying principles and damaged ordinary investors as a result.

3.    Weber manufactures and sells barbecue grills and related merchandise. It was a private company for the majority of its corporate existence until an outside investor by the name of BDT Capital (defined below) acquired a controlling stake in the company. In 2021, BDT Capital

took Weber public. The timing of the IPO was ideal given that Weber had just reported record-breaking sales thanks to widespread "stay-at-home" orders during the height of the COVID pandemic. Weber used these sales figures to successfully promote itself and sell over $250 million in stock to the general public. The registration statement and offering materials used to sell these shares, however, did not abide by the "full and fair" disclosure principles underlying our securities laws. Weber's pandemic sales were neither sustainable nor indicative of heightened demand for its products and despite having information in its possession bearing that out, Defendants said nothing of it.

4. The COVID pandemic changed the lifestyles of millions of people. As "stay-at-home" orders went into effect to keep infection rates as low as possible, people reprioritized their spending on items such as home furnishings and outdoor equipment. This translated into big business for many corporations in the consumer discretionary sector. Analysts and investors dubbed the trend the "pandemic pull-forward," referring to sales that companies were able to realize on an accelerated basis as a result of consumers deciding to make home-related purchases because of the COVID pandemic.

5. For Weber, the "pull-forward" resulted in record-breaking sales that snapped a several-year long period of stagnant growth. Between 2013 and 2019, Weber had a compound annual growth rate of only 2.3% with revenues at or below $1.34 billion. In 2020 and 2021, Weber's sales jumped to $1.525 billion and $1.98 billion, representing growth of 18% and 30%, respectively. While Weber attributed these sales to a newfound strength in consumer demand and the market, in truth they were due to a "pull-forward" of existing Weber customers simply making "replacement purchases" (*i.e.*, buying new grills to replace old ones) earlier than scheduled due to the COVID pandemic.

6.     Weber tracked its "replacement purchases" closely. According to Weber's senior officers, "replacement purchases" occurred every seven years among its preexisting customers. Historically, these "replacement purchases" accounted for approximately 6.67% of Weber's overall sales. In 2020 and 2021, however, these "replacement purchases" comprised between 60% and 70% of overall sales. Moreover, given that these "replacement purchases" were simply a function of the pandemic "pull-forward," Weber would not be able to rely on these sales occurring at the same rate or level going forward as the pandemic subsided.

7.     Defendants did not disclose this in the registration statement or any of Weber's other offering documents for the IPO. Instead, they promoted Weber's record-breaking sales and attributed them to "ongoing consumer shifts" that would "continue in the future" and "trends" that would benefit Weber "even after the pandemic recedes." Weber also provided incomplete information relating to market surveys that left investors believing its newfound market strength was due to "growth driven by increasing demand." It was on these representations that BDT Capital was successfully able to take Weber public and sell ordinary investors hundreds of millions of dollars of stock in the IPO.

8.     Following the IPO, market analysts began to question whether Weber's COVID sales indicated new demand or were just a result of the pandemic "pull-forward." The answer to this question became evident over the course of the following year as the pandemic started to subside and demand for Weber's grills flagged. Sales declined, earnings were missed, and Weber's stock price fell. Investors who had bought stock during the IPO ultimately lost millions of dollars as the truth revealed itself.

9.     Now, just a little over 18 months after going public, BDT Capital is on the verge of taking Weber private once again. If the deal closes as anticipated at $8.05 per share, BDT Capital

will have effectively repurchased the company for nearly half of what it sold it to investors in the IPO. This reality, combined with the fact that BDT Capital and other insiders extracted $500 million in cash from Weber just prior to the IPO, is proof positive that the public shareholders in this case did not receive a fair deal. They deserve to be compensated for at least the damages they incurred as a result of Defendants' violations under the federal securities laws.

## II.   <u>JURISDICTION AND VENUE</u>

10.    The claims asserted herein arise under and pursuant to §§ 11 and 15 of the Securities Act (15 U.S.C. §§ 77k and 77o, respectively).

11.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and § 22 of the Securities Act (15 U.S.C. § 77v). In connection with the acts, transactions, and conduct alleged herein, Defendants directly and/or indirectly used the means and instrumentalities of interstate commerce, including the U.S. mail, interstate telephone communications and the facilities of a national securities exchange.

12.    Venue is proper in this District pursuant to 28 U.S.C. §1391(b) and § 22 of the Securities Act (15 U.S.C. § 77v). Substantial acts charged herein, including the preparation and/or dissemination of materially false and/or misleading information, and in furtherance of the alleged fraud or the effects of the fraud, have occurred in this Judicial District. Defendants are found or transact business in this District and Weber was headquartered in this District at all relevant times.

## III.   <u>THE PARTIES</u>

### A.   **Plaintiff**

13.    As set forth in his previously filed certification (ECF No. 10-1), incorporated by reference herein, Plaintiff purchased or otherwise acquired Weber Class A common stock pursuant and/or traceable to the Registration Statement for the IPO, and was damaged thereby.

B.  **Defendants**

1.  Weber, Inc.

14.     Defendant Weber is a Delaware Corporation with its principal executive office located at 1415 S. Roselle Road, Palatine, Illinois 60067. Following the IPO, the Class A common stock of Weber trades on the New York Stock Exchange ("NYSE") under the ticker symbol "WEBR."

2.  The Individual Defendants

15.     Defendant Christopher M. Scherzinger ("Scherzinger") served as Chief Executive Officer ("CEO") and a Director of Weber from April 2018 until being replaced by interim CEO Alan Matula on July 25, 2022. Scherzinger signed the Registration Statement on behalf of himself and Weber.

16.     Defendant William J. Horton ("Horton") served as Chief Financial Officer ("CFO") at Weber from June 2018 until January 31, 2023. Horton signed the Registration Statement.

17.     Defendant Marla Y. Kilpatrick ("Kilpatrick") served as Weber's Global Controller until June 7, 2022, and Chief Accounting Officer until December 14, 2022. Kilpatrick signed the Registration Statement.

18.     Defendant Kelly D. Rainko ("Rainko") has served as a Director of Weber since 2010 and Non-Executive Chair of the Board since July 2021. Rainko signed the Registration Statement.

19.     Defendant Elliott Hill ("Hill") has served as a Director of Weber since August 2020. Hill signed the Registration Statement.

20.     Defendant Martin McCourt ("McCourt") has served as a Director of Weber since January 2019. McCourt has served as a member of Weber's Audit Committee since August 4, 2022. McCourt signed the Registration Statement.

21.     Defendant Melinda R. Rich ("Rich") has served as a Director of Weber since July 2021.  Rich signed the Registration Statement.

22.     Defendant James C. Stephen ("Stephen") served as President and CEO of Weber after his father, George Stephen, died in 1993. Stephen also served as a Director of Weber since 2010 and Executive Chairman of Weber since 2013 until stepping down on August 4, 2022. Stephen signed the Registration Statement.

23.     Defendant Susan T. Congalton ("Congalton") has served as a Director and Chair of the Audit Committee of Weber since January 2016. Congalton signed the Registration Statement.

24.     Defendant Magesvaran Suranjan ("Suranjan") has served as a Director and a member of the Audit Committee of Weber since July 2021. Suranjan signed the Registration Statement.

25.     Collectively, Scherzinger, Horton, Kilpatrick, Rainko, Hill, McCourt, Rich, Stephen, Congalton, and Suranjan are referred to as the "Individual Defendants." Each of the Individual Defendants signed, or authorized the signing of, the Registration Statement for the IPO. Each of the Individual Defendants also reviewed and helped prepare the Registration Statement.

3.     Underwriter Defendants

26.     Defendants Goldman Sachs & Co., LLC ("Goldman Sachs"), BofA Securities, Inc. ("BofA"), J.P. Morgan Securities LLC ("J.P. Morgan"), BMO Capital Markets Corp. ("BMO"), Citigroup Global Markets Inc. ("Citigroup"), UBS Securities LLC ("UBS"), Wells Fargo Securities, L.L.C. (Wells Fargo"), KeyBanc Capital Markets Inc. ("KeyBanc"), Academy Securities, Inc. ("Academy"), Cabrera Capital Markets LLC ("Cabrera"), Siebert Williams Shank & Co., LLC ("SWS"), and Telsey Advisory Group LLC ("Telsey") (collectively, the "Underwriter Defendants") are financial services companies that served as an underwriters for the IPO.

Defendants Goldman Sachs, BofA, and J.P. Morgan acted as managing underwriters for the IPO and as representative of the underwriters involved in the IPO.

27. Defendant Goldman Sachs is a New York limited liability company whose principal executive office is located at 200 West Street, New York, New York 10282. Goldman Sachs operates as an investment management company. The Registration Statement represented that shares of Weber Class A common stock purchased by Goldman Sachs would be offered for sale by Goldman Sachs to the public at the IPO price. Accordingly, Goldman Sachs acted as an underwriter of the IPO and is liable under the Securities Act in the same manner and to the same extent as the other underwriters.

28. Defendant BofA is a Delaware corporation whose principal executive office is located at 222 Broadway, New York, New York 10038. BofA is a brokerage firm that offers buying and selling of securities. The Registration Statement represented that shares of Weber Class A common stock purchased by BofA would be offered for sale by BofA to the public at the IPO price. Accordingly, BofA acted as an underwriter of the IPO and is liable under the Securities Act in the same manner and to the same extent as the other underwriters.

29. Defendant J.P. Morgan is a Delaware limited liability company whose principal executive office is located at 383 Madison Avenue, New York, New York 10179. J.P. Morgan operates as an investment management company. The Registration Statement represented that shares of Weber Class A common stock purchased by J.P. Morgan would be offered for sale by J.P. Morgan to the public at the IPO price. Accordingly, J.P. Morgan acted as an underwriter of the IPO and is liable under the Securities Act in the same manner and to the same extent as the other underwriters.

30.     Defendant BMO is a Delaware corporation whose principal executive office is located at 3 Times Square, New York, New York 10036. BMO is an investment management company. The Registration Statement represented that shares of Weber Class A common stock purchased by BMO would be offered for sale by BMO to the public at the IPO price. Accordingly, BMO acted as an underwriter of the IPO and is liable under the Securities Act in the same manner and to the same extent as the other underwriters.

31.     Defendant Citigroup is a Delaware corporation whose principal executive office is located at 388 Greenwich Street, New York, New York 10013. Citigroup is a multinational investment bank that provides a broad range of financial services to consumers and corporate customers. The Registration Statement represented that shares of Weber Class A common stock purchased by Citigroup would be offered for sale by Citigroup to the public at the IPO price. Accordingly, Citigroup acted as an underwriter of the IPO and is liable under the Securities Act in the same manner and to the same extent as the other underwriters.

32.     Defendant UBS is a Delaware limited liability company whose principal executive office is located at 1285 Avenue of the Americas, New York, New York 10019. UBS provides investment banking services worldwide, including equities sales and trading. The Registration Statement represented that shares of Weber Class A common stock purchased by UBS would be offered for sale by UBS to the public at the IPO price. Accordingly, UBS acted as an underwriter of the IPO and is liable under the Securities Act in the same manner and to the same extent as the other underwriters.

33.     Defendant Wells Fargo is a Delaware limited liability company whose principal executive office is located at 550 South Tryon Street, Charlotte, North Carolina 28202. Wells Fargo provides investment banking services. The Registration Statement represented that shares

9

of Weber Class A common stock purchased by Wells Fargo would be offered for sale by Wells Fargo to the public at the IPO price. Accordingly, Wells Fargo acted as an underwriter of the IPO and is liable under the Securities Act in the same manner and to the same extent as the other underwriters.

34.    Defendant KeyBanc is an Ohio corporation whose principal executive office is located at 127 Public Square, Cleveland, Ohio 44114. KeyBanc provides investment advisory services. The Registration Statement represented that shares of Weber Class A common stock purchased by KeyBanc would be offered for sale by KeyBanc to the public at the IPO price. Accordingly, KeyBanc acted as an underwriter of the IPO and is liable under the Securities Act in the same manner and to the same extent as the other underwriters.

35.    Defendant Academy is a Delaware corporation whose principal executive office is located at 622 3rd Ave 12th floor, New York, New York 10017. Academy is an investment banking company. The Registration Statement represented that shares of Weber Class A common stock purchased by Academy would be offered for sale by Academy to the public at the IPO price. Accordingly, Academy acted as an underwriter of the IPO and is liable under the Securities Act in the same manner and to the same extent as the other underwriters.

36.    Defendant Cabrera is a Delaware limited liability company whose principal executive office is located at 10 South LaSalle Street, Suite 1050, Chicago, Illinois 60603. Cabrera is a national institutional banking and brokerage firm. The Registration Statement represented that shares of Weber Class A common stock purchased by Cabrera would be offered for sale by Cabrera to the public at the IPO price. Accordingly, Cabrera acted as an underwriter of the IPO and is liable under the Securities Act in the same manner and to the same extent as the other underwriters.

37.     Defendant SWS is a Delaware limited liability company whose principal executive office is located at 100 Wall Street, 18th Floor, New York, New York 10005. SWS is an investment management company. The Registration Statement represented that shares of Weber Class A common stock purchased by SWS would be offered for sale by SWS to the public at the IPO price. Accordingly, SWS acted as an underwriter of the IPO and is liable under the Securities Act in the same manner and to the same extent as the other underwriters.

38.     Defendant Telsey is a Delaware limited liability company whose principal executive office is located at 535 Fifth Avenue, 12th Floor, New York, New York, 10017. Telsey is a research, trading, banking, and consulting brokerage firm. The Registration Statement represented that shares of Weber Class A common stock purchased by Telsey would be offered for sale by Telsey to the public at the IPO price. Accordingly, Telsey acted as an underwriter of the IPO and is liable under the Securities Act in the same manner and to the same extent as the other underwriters.

39.     The Underwriter Defendants severally agreed to purchase all of the Weber shares of Class A common stock being offered in the IPO. The following table specifies the number of shares each Underwriter Defendant agreed to purchase from Weber:

| Underwriters | Number of Shares |
|---|---|
| Goldman Sachs & Co. LLC | 5,357,143 |
| BofA Securities, Inc. | 5,357,143 |
| J.P. Morgan Securities LLC | 2,678,572 |
| BMO Capital Markets Corp. | 937,500 |
| Citigroup Global Markets Inc. | 937,500 |
| UBS Securities LLC | 937,500 |
| Wells Fargo Securities, LLC | 937,500 |
| KeyBanc Capital Markets Inc. | 321,429 |
| Academy Securities, Inc. | 98,214 |
| Cabrera Capital Markets LLC | 98,214 |
| Siebert Williams Shank & Co., LLC | 98,214 |
| Telsey Advisory Group LLC | 98,214 |

| Total | 17,857,143 |
|-------|-----------|

40.     In addition, the Underwriter Defendants held an option to buy up to an additional 2,678,571 shares of Class A common stock.

41.     The Underwriter Defendant participated in the drafting and dissemination of the Registration Statement and failed to perform adequate due diligence in connection with their roles as underwriters. As a result, they were negligent in failing to ensure that the Registration Statement was prepared accurately and in accordance with the rules and regulations governing its preparation. Additionally, they participated in preparing road show and other materials used to solicit Class A common stock purchasers in connection with the IPO.

### 4.     BDT Capital Partners, LLC

42.     Defendant BDT Capital Partners, LLC (collectively with its controlled entities and affiliates, "BDT Capital") is beneficially owned and/or controlled by Byron D. Trott. BDT Capital maintains its primary office at 401 North Michigan Avenue, Suite 3100, Chicago, IL 60611.

43.     In or around December 2010, BDT Capital acquired a majority stake in Weber-Stephen Products LLC. Weber-Stephen Products LLC was the entity through which Weber conducted its business prior to the IPO.

44.     BDT Capital was at all relevant times Weber's controlling shareholder.

45.     BDT Capital sponsored Weber's IPO and, upon its completion, held 62.1% of Weber's voting power.

46.     The Registration Statement stated that, upon completion of the IPO, "entities controlled by [BDT Capital] will be able to control any action requiring the general approval of our stockholders, including the election of our board of directors, the adoption of amendments to

our certificate of incorporation and bylaws and the approval of any merger or sale of the Company [Weber] or substantially all of our assets."

47.     Rainko serves as a Partner and member of the Executive Committee of BDT Capital, which she joined at its founding in May 2009.

48.     Hill serves as a Senior Advisor to BDT Capital.

49.     McCourt serves as an Operating Partner of BDT Capital.

50.     Rich also as an Advisor to BDT Capital.

51.     BDT Capital together with WSP Investment, LLC and certain members of Weber's management, including Scherzinger, Horton, Hill, and McCourt, are referred to herein as the "Pre-IPO LLC Members".

### C.     Relevant Non-Parties

52.     George Stephen founded Weber and was its majority shareholder until December 2010 when BDT Capital purchased a majority stake in Weber-Stephen Products, LLC. George Stephen's son, James C. Stephen (previously defined as "Stephen"), and the Stephen family beneficially owned and/or controlled a number of investment vehicles that held equity interests in Weber prior to the IPO, including but not limited to Weber-Stephen Products LLC, WSP Investment LLC, and WSP Management Pool LLC.

53.     Alan D. Matula ("Matula") replaced Scherzinger as Weber's CEO on July 25, 2022. Prior to replacing Scherzinger, Matula served as Weber's Chief Technology Officer and, prior to that, Weber's Chief Information Officer.

IV.    **SUBSTANTIVE ALLEGATIONS**

    A.    **Company Background.**

54.    Weber primarily manufactures and sells barbecue grills and smokers. Weber also sells fuel products and offers serving accessories, grill care, merchandise, grilling guides and recipe books. Weber's grill sales account for approximately 74% of its total revenues.

55.    Weber sells its grills through retailers, hardware and wholesale stores as well as through their independently operated Weber experience stores. Weber also sells through a direct-to-consumer channel in which consumers can shop for and purchase Weber products on its website.

56.    Weber's fiscal year ends on September 30. Its primary selling season occurs in the second and third quarters (January through June). During this time, Weber primarily sells its inventory to retailers who will then sell it to end consumers throughout the spring and summer months. Weber's sales are typically lower during the first and fourth quarters (July through December), with the exception of its operations in Australia and New Zealand due to the counter seasonal nature of this region.

    B.    **Weber's Sales Growth Stagnates Prior to the COVID-19 Pandemic.**

57.    Weber's annual revenue typically consists of three components: (1) grill sales to first-time grill buyers or consumers purchasing second grills with a different fuel type ("first-time purchases"); (2) grill sales to consumers who have previously purchased a grill of the same fuel type ("replacement purchases"); and (3) the sale of Weber branded solid fuel and other accessories.

58.    Historically, replacement purchases did not account for a significant percentage of Weber's annual sales. According to Weber, "more than 30 million grills [of 70 million base units in U.S. households] are Weber grills, based on MetrixLab, and are being replaced at a rate of over

2 million units per year." Thus, replacement purchases accounted for approximately 6.67% of Weber's annual sales.

59.     Weber's growth from 2013 through 2019 had slowed dramatically. During those years, Weber's compound annual growth rate (or "CAGR") was only 2.3%, as demonstrated below:



60.     Weber closely tracked replacement purchases relative to overall sales through its dedicated "insights team." Weber described its "insights team" in various filings with the SEC, including the Registration Statement which stated in pertinent part that: "From 2018 to 2020, . . . we have bolstered our consumer insights, analytics and marketing team, hiring over 40 new positions in the last 12 months, to strengthen our marketing organization and build broader capabilities."

61.     According to Scherzinger, Weber's "insights team" studied replacement sales routinely, as he explained during the 3Q21 earnings call on September 15, 2021, where he stated in pertinent part: "And I want to hit the other question . . . around volume sourcing. I don't really

have any new information around repeats or replenishments, if you will, repurchase volume of existing grills versus new grill category entrants. Honestly, we do look at that at the end of the year on an annual basis, and so that's probably work that's going on with our insights team right now. So I will check in with them and we'll have that information for you if we can next time we talk . . . ."

62. The average length of time between a customer's first-time purchases and their replacement purchases (the "replacement cycle") was seven years. During Weber's conference call with investor to discuss its financial results for 3Q22 on August 15, 2022, Horton confirmed that Weber's replacement cycle has historically been seven years, stating in relevant part:

> **Arpine Kocharyan**
> <UBS Investment Bank, Research Division – Director and Analyst>
>
> . . . Could you -- what is the more typical replacement sales annually in your business? [] How quickly does the customer replace a grill in general in Americas or outside of U.S. or North America based on kind of your internal stats?
>
> **Defendant Horton**
> <Weber Inc. – CFO>
>
> In general, we've -- *as we discussed during the IPO process, generally, 7 years has been our historical replacement cycle*.

(emphasis added)

63. Consequently, Weber tracked its replacement purchases relative to new customer sales and knew or should have known the outsized role they were having on Weber's overall sales during COVID (*i.e.*, fiscal 2020 and 2021) and at/around the time of the IPO, as explained below.

**C. Weber's Explosive Revenue Growth in FY '20 and '21 Was Primarily Attributable to the Pull-Forward Demand of Replacement Purchases.**

64. For Weber and other companies in the consumer discretionary sector, the COVID pandemic prompted a material increase in sales and earnings as consumers spent outsized portions of their income on "stay at home" products and services. The increase in sales and earnings caused

16

by the COVID pandemic constituted a trend or uncertainty that had a material impact on sales, revenue, and income. The trend facilitated an acceleration of sales among current and future customers that allowed companies to sell products and services to customers earlier than if the pandemic had not occurred. To illustrate, while John Doe might have intended to replace his current barbecue grill in 2022, he instead made the purchase in 2020 because of how much time he would be spending at home as a result of societal changes brought on by the pandemic. Analysts referred to this trend as the "pandemic pull-forward."

65.     This trend was most pronounced within the consumer discretionary sector. Companies like Netflix, Peloton, and Restoration Hardware experienced surges in sales with the onset of the pandemic. As one analyst noted in October 2020, Netflix "beat expectations on revenue" in 3Q20, Peloton had seen a "surge in sales of its bikes," and Restoration Hardware was "up 200% during the pandemic (since March 15), as shoppers have bought new home furnishings to spruce up their home-work space."[1]

66.     The phenomenon of the pandemic "pull forward" was widely discussed by analysts and market participants in 2020. Indeed, articles readily acknowledged that "[t]he idea of a 'pull forward in demand' has come up time and again during the COVID-19 pandemic, used by analysts in reference to a number of companies that saw a boost in the early months of stay-at-home orders."[2] By April 2021, "pull forward" was "the accepted term for the pandemic-related boost in sales that many companies [had] reported in their Q1 earnings. The concept [was] logical enough: Covid-19 created an artificial improvement in earnings over the last few quarters due to the

---

[1] Daniel Roberts, *Netflix's Q3 demonstrates the dreaded 'pandemic pull-forward in demand'* (Yahoo! Finance, Oct. 21, 2020).

[2] *Id.*

suitability of a company's product for a stay-at-home environment, or pent-up demand as restrictions ease, but that either way, that improvement is not sustainable."[3]

67.     As the pandemic dissipated in late-2021 and into 2022, the pandemic "pull forward" also disappeared. Companies that had enjoyed increased earnings from the "pull forward" began to revert to average and below-average earnings due to an exhausted customer base. Some companies, however, continued to experience above-average sales. For example, Home Depot experienced record-breaking quarters between April 2020 and April 2021 with double-digit same-store sales growth. While its pace of growth slowed in late-2021, sales remained strong in part to a "lasting increase in home-improvement demand."[4] Thus, while the pandemic "pull forward" phenomenon increased earnings within the consumer discretionary sector, this increase varied from company to company in terms of how long it lasted.

68.     Most companies to experience the "pull-forward" were forthright and accurate when discussing its impact on operations and earnings with investors. For example, in September 2020, Richard Olson, CEO of The Toro Company (designs, manufactures, and markets lawn mowers, snow blowers, and irrigation system supplies), answered analyst questions about the "pull forward" effect and acknowledged that the pandemic bump in earnings would not be sustained. In pertinent part, Mr. Olson said as follows:

> **David Sutherland MacGregor**
> <Longbow Research LLC - CEO, Director of Research & Senior Analyst>
>
> Right. Rick, if we could just build off that last point you were making, *I guess one thing that most investors are struggling with, not just with Toro, but with pretty much all the companies that we're dealing with in this space, it's just the degree*

---

[3] Martin Tillier, *The Real 'Pull Forward' is in Stock Prices, Not Earnings; What that Means for Investors* (Nasdaq.com Apr. 28, 2021).

[4] Matt Grossman, *Home Depot Sales Rise, Continuing Pandemic Streak* (The Wall Street Journal, Nov. 16, 2021).

*of pull-forward that may be occurring here. And clearly, there's some pull-forward. The question is just how much.*

I'm guessing you guys maintain models to help you better understand that. *Is there anything you can say to help us better understand kind of the extent of pull-forward demand that is just augmented growth here versus what would be perceived as maybe a more sustainable level of growth*?

**Richard M. Olson**
<The Toro Company - Chairman, President & CEO>

*Yes. I think you've seen the catch-up happen in this quarter, and there will continue to be maybe a little bit of that. But we see the patterns returning back towards more normal buying cycle patterns even as we look forward into our fourth quarter here as we've gotten started with it.*

So it was clearly a factor in this quarter that you can see, but that's not a dominant factor as we go forward. But it's more professional customers are returning to their normal buying patterns.

As we've said in the past, though, with turf-related products, those products are used as the grass is growing. So they continue to be consumed. And they do have to get back on their buying cycle, their normal buying cycle.

69.     Similarly, in May 2021, Jill Woodworth, Peloton's CFO, explained to analysts and investors that the company's "outperformance" in its third quarter of 2021 was "due to the pull forward of deliveries." In October 2021, Benjamin Bollin, CEO of Garmin Ltd., acknowledged increased sales due to "pull forward during COVID." In December 2021, Calvin McDonald, Lululemon's CEO, similarly addressed the company's sales and how much was due to a "pull-forward."

70.     The companies listed above (*i.e.*, Toro Company, Peloton, Garmin Ltd., and Lululemon) were identified by Weber as being part of a "peer group" of companies. These companies operated within the same industry and/or sector (*i.e.*, consumer discretionary) and experienced similar market headwinds in relation to COVID. Weber compared itself to these companies immediately prior to the IPO to assess compensation for its executives against

"comparable companies" that were of "similar size and relevant industry," "in the same or similar lines of business," "compete for the same customers with similar products and services," and "within a reasonable range in terms of percentile rank of Weber for key financial metrics such as revenue, pre-tax income, total assets, total equity, total employees, market capitalization, and composite percentile rank." Weber routinely reviewed itself against the "peer group" of companies, which was compiled by Weber's directors, and therefore was aware of how COVID affected the "peer group" of companies and the disclosures made by the "peer group" of companies in response to the pandemic "pull-forward".

### D. Weber Experienced a Spike in Sales from COVID "Pull-Forward".

71. Weber experienced significant sales and earnings due to the pandemic. In 2020, Weber reported $1,525.3 million versus $1,296.2 million in 2019, representing year-over-year growth of 18%. Weber's pandemic revenue growth continued the following year, reporting $1,982.4 million in revenue in 2021; a 30% increase over the $1,525.3 million achieved in 2020. Moreover, as demonstrated below, Weber's revenue in 2021 was a 52.9% increase over its 2019 revenue:



72.     Weber experienced heightened demand during the COVID pandemic as many consumers were forced to stay at home, prepared food themselves, and invested in outdoor cooking. The Registration Statement explained that the COVID environment "encouraged consumers to cook at home and enjoy the benefits of outdoor grilling," which created "increased demand for our grill and accessories[.]"

73.     In the Registration Statement, Weber told investors that it would "continue to benefit from these [COVID] trends even after the pandemic recedes." For example, the Registration Statement stated that Weber expected continued resiliency and growth resulting from COVID's impact on its consumers and their behaviors:

> We believe that several fundamental shifts in consumer behavior are providing positive tailwinds for our industry, including the increasing adoption of outdoor lifestyles and rising focus on health and wellness. More than half (54%) of consumers report cooking more in 2020 and 52% of people cited health as one of their top reasons for cooking at home based on a survey from Hunter PR. The COVID-19 pandemic accelerated certain trends that benefited our industry, and, according to a 2020 survey of grill owners, 85% of grillers globally expect to grill as often or more often after the pandemic than they did before the pandemic. We believe that the grill represents the center of any outdoor lifestyle and ***our industry will see continued resiliency through the business cycle and growth driven by increasing demand for outdoor spaces***.

(emphasis added)

74.     But crucially, the COVID pandemic did not impact all types of consumer demand equally. Weber's abrupt surge of sales in FY '20 and '21 were primarily caused by the COVID pandemic accelerating—or "pulling forward"—routine replacement purchases that were expected to occur in subsequent years. Regarding the "sizeable" pull-forward of sales that occurred during COVID, UBS estimated that "over 60% of sales for Weber during Covid (FY'20 and '21) were replacement sales, and in FY'20 over 70% of sales were replacement sales." UBS again highlighted the discrepancy between CAGR prior to and during COVID.

75. Put differently, Weber's surge in sales was **not** driven by new grill purchasers from "continued resiliency" or "growth driven by increasing demand," but instead primarily caused by consumers making replacement purchases earlier or on an accelerated basis. The "pull-forward" of replacement purchases thus created a corresponding material lack of demand in subsequent years when consumers otherwise would have made their replacement grill purchases.

76. In this manner, Weber did not experience sales growth in FY '20 and '21 as a result of penetrating new markets or attracting new customers. Instead, Weber experienced a pull-forward of regularly recurring future replacement sales, such that those replacements would be absent in future years. Weber knew or should have known this risk to future sales and disclosed it accurately.

**E.     Insider Corporate Transactions as Weber Pushes Forward with IPO.**

77. On October 30, 2020, ten months before the IPO, Weber entered into a new credit facility (the "Secured Credit Facility"). The Secured Credit Facility provided Weber with an initial term loan of $1.25 billion and a revolving credit facility of $300 million. The Secured Credit Facility left Weber with a significant amount of cash, even after using approximately half of the term loan ($616.3 million) to pay off Weber's previous credit facility.

78. Between October 30, 2020 and June 30, 2021, Weber used over $500 million from its cash and Secured Credit Facility to repurchase pre-IPO shares (equity interests) and distribute a dividend to the Pre-IPO LLC Members, including BDT Capital, the Stephen family, and certain members of Weber's management such as Scherzinger, Horton, Hill, and McCourt. Stephen and his family-owned entities received approximately $188.9 million in exchange for pre-IPO shares while BDT Capital and other pre-IPO shareholders (including Scherzinger, Horton, Hill, and McCourt) received approximately $315.5 million.

79. On July 12, 2021, Weber filed a registration statement with the SEC on Form S-1.

80.     On July 27, 2021, Weber filed an amended registration statement with the SEC on Form S-1/A disclosing that the number of shares to be registered and sold in the IPO was expected to be approximately 54 million shares at a maximum price of $17 per share. The expected proceeds from this offering would total more than $915 million.

81.     On August 4, 2021, the SEC declared Weber's registration statement "effective."

82.     On August 5, 2021, Weber filed a free writing prospectus with the SEC changing the price and volume of shares to be sold in the IPO. According to the free writing prospectus, Weber would now sell in the IPO approximately 17.9 million shares (or 20.5 million shares with the over-allotment option) at $14 per share. Accordingly, the net proceeds from the IPO would be $237.5 million instead of the previously anticipated $915 million. Additionally, the free writing prospectus indicated that "[c]ertain pre-IPO LLC members have agreed to purchase an aggregate of 1,000,000 shares of Class A common stock in this offering at the public offering price."

83.     On August 6, 2021, Weber filed a final prospectus on Form 424(b)(4) which incorporated the prior registration statements and free writing prospectus (collectively, the "Registration Statement"). Weber stock began trading on the NYSE that same day under the ticker "WEBR."

84.     On August 9, 2021, BDT Capital bought 1 million shares of Class A common stock at $14 per share. This allowed Weber to close its IPO with a total of 17,857,143 shares of Class A common stock sold at an offering price of $14.00 per share. The IPO generated $250 million in gross proceeds with Weber receiving $237.5 million in net proceeds after deducting underwriting discounts and commissions and IPO expenses. In connection with the closing of the IPO, Weber repaid $220.1 million to its Secured Credit Facility.

85.     On August 19 and 27, 2021, the Underwriter Defendants exercised their option to purchase additional shares in the IPO and, as a result, Weber sold another 2,678,571 shares of Class A common stock resulting in an additional $35.6 million in net proceeds.

**F.      Post-IPO Events.**

1.      Analysts Slowly Learn about the COVID-19 Pandemic Pulled-Forward Demand into FY'20 and '21.

86.     On August 29, 2021, Citi initiated coverage with a "neutral" rating and price target of $18 per share (which was above Weber's closing price of $16.27 per share on August 29, 2021). In its report, Citi expressed concern over potential "pull forward" related to COVID. Citi wrote, in pertinent part:

> With WEBR having benefited from strong COVID-fueled sales tailwinds over the last year, the company is coming up against some very tough compares. Additionally, given the long replacement cycle for WEBR grills, ***we are a bit nervous that there may have been a 'pull forward' of demand for grilling equipmen***t. Across our coverage universe, we have seen several companies struggle to contend with these issues and we believe investor scrutiny is even higher for newly-IPO'd companies. In our minds, with WEBR's next few quarters comping particularly strong growth in the year-ago period, for now we prefer to sit on the sidelines.
>
> . . .
>
> . . . As we have seen from many of our HPC and CPG companies, WEBR experienced heightened demand during COVID as many people stayed at home, prepared food themselves, and invested in outdoor living. While WEBR has not quantified the magnitude of the COVID sales benefit, mgmt [management] openly admits that COVID provided a sales tailwind and that growth should slow somewhat from these elevated levels as the environment normalizes. ***However, as opposed to merely being a fad, mgmt [management] believes that the pandemic accelerated trends towards outdoor cooking, which were already underway***. . . . .

(emphasis added)

87.     UBS also initiated coverage at this point. On August 30, 2021, UBS released an initiation report with a "neutral" rating and a price target of $17 per share. Similar to Citi, UBS

wrote that a "key investor debate" for Weber would be "what [a] post-Covid normalized demand curve looks like. Outdoor cooking industry was, among other consumer sectors, a beneficiary of Covid lockdown induced demand, so the industry debate of whether there has been a pull forward of future demand or simply an acceleration of demand creation that was already there – is here to stay." UBS also noted "FY'20 saw an extraordinarily high replacement purchases at closer to 70% of sales" and questioned that "[w]hile investors might prefer the predictability and recurring aspect of this dynamic, whether that replacement rate is sustainable in a post-Covid environment and what a more normalized replacement rate looks like will remain a key debate for investors."

88.     Following Citi's and UBS's initiation reports, Weber's stock price declined from $16.95 per share on August 30, 2021 to $16.26 per share on August 31, 2021. Weber's stock price continued to decline over the following days, falling to below $14 per share within the first two weeks of September 2021 (*i.e.*, $13.92 per share on September 14, 2021). The decline in Weber's stock price following Citi's and UBS's initiation reports was due to uncertainty and confusion caused by Defendants' false and/or materially misleading statements in the Registration Statement about existing and expected demand for Weber's products.

89.     On May 16, 2022, Weber held a conference call with investors to discuss its financial results for its second quarter of 2020 ("2Q22 Earnings Call"). During the 2Q22 Earnings Call, Scherzinger suggested that Weber's demand was pulled-forward due to the COVID pandemic, providing, in pertinent part:

**Christopher Michael Carey**
<Wells Fargo Securities, LLC, Research Division – Senior Equity Analyst>

I was wondering if -- I appreciate that the environment has certainly become more difficult and weather was arguably -- historically that. ***Do you have perhaps a little bit more perspective now that we're getting into new grilling season just around any impact of the pull forward in demand from COVID? Was it more than perhaps what you were thinking?*** Second, I'm just curious, how you feel about

25

market shares in the quarter and whether you think that you held share or not going into this year? And then I have a follow-up.

**Chris M. Scherzinger**
<Weber Inc. – CEO & Director>

Sure. Thanks, Chris. This is Chris. And I appreciate the question. It is a -- it's been the puzzle for a couple of years now to figure out what 2020 and 2021 meant. The one thing I would say on demand this year, and I would point even to the Q2 performance. And ***this is a consistent message that we've noted in the data and continues to be true today is that the pandemic, while it did drive a lot of incremental sales, and I do -- I am a believer in the pull-forward dynamic for fiscal 2020, if you go back to the start of the pandemic, I don't believe as much in pull forward in 2021***. And what I would point to is the 2-year stack.

And so when you look at where sales are this year, even in Q2, I think we mentioned we were up 46% on a 2-year stack basis versus 2020. And if you look at on a pre-pandemic level, if you go back to 2019, we were up 35% in the quarter and 37% on a year-to-date basis.

And so the way that I frame this in prior dialogues is ***we believe that the pandemic heightened consumer engagement in the category and it established a new base of operations, if you will, for the category. And that continues to be true in our sales today***. So while there were onetime purchases, particularly in 2020, we would characterize those in many cases, as people who had an old grill and that was the impetus to update their product line. We haven't seen an enormous pull-forward dynamic, particularly in 2021.

So I think the dynamics that are going on in '22 are more around all of the macro pressures on consumers, the inflation pressure on the prices of gas and groceries, the pressure of the volatile stock market on things like 401(k) savings or just consumer confidence more broadly. And those factors to me are more fundamental to the drop in retail traffic and category-wide performance. I don't think that there's a huge pull forward problem in '22 versus '21.

(emphasis added)

90.     On May 16, 2022, following the conference call, Citi reported that Weber missed 2Q22 revenue targets and had lowered its full-year revenue and EBTIDA guidance. According to Citi, while Weber attributed its poor performance to factors such as declining retail foot traffic, macro factors, and foreign exchange headwinds, Citi said it "remain[ed] cautious that WEBR's track record of results has been spotty since its IPO last year" and that it was "cognizant that these

headwinds come at a bad time for WEBR given they are feeding concerns that the company is unwinding from its COVID-fueled sales & profitability growth (and hence some folks believe the recent slowdown could be more structural in nature)." Citi also told investors that "longer-term sales growth is more sluggish given the long replacement cycle for WEBR grills and the recent 'pull forward' of demand for grilling equipment."

91.    Weber's stock price declined following the quarterly earnings report and negative analyst reactions. From a closing price of $7.11 per share on May 16, 2022, Weber's stock price fell to $6.95 per share on May 17, 2022. It continued to fall over the next few days, reaching $6.86 per share on May 18, 2022.

92.    On July 25, 2022, before the market opened, Weber announced its preliminary third quarter 2022 ("3Q22") financial results, including lower than expected net sales between $525 million and $530 million, and announced that it was withdrawing its fiscal year 2022 Net Sales and Adjusted EBITDA guidance. Weber attributed its miss to slower retail traffic in-store and online, across all markets, as well currency devaluations. Weber stated it believed that slower retail traffic patterns "are the result of pressured consumer shopping behaviors globally, due to rising inflation, supply chain constraints, fuel prices, and geopolitical uncertainty." Weber advised these "market headwinds" were expected to continue into fiscal fourth quarter of 2022. Weber blamed its rapidly-declining performance on "historic macroeconomic challenges," quoting Rainko as stating:

> We are taking decisive action to better position Weber to navigate historic macroeconomic challenges, including inflationary and supply chain pressures that are impacting consumer confidence, spending patterns, and margins[.] The management team is well positioned to guide Weber through this transitional period and execute a transformation of the Company's cost base.

93.    Weber further announced it was pursing "a number of financial transformation initiatives, which may include workforce reductions, reducing other COGS and SG&A expenses,

as well as tightening its global inventory levels and working capital positions." The July 25, 2022 press release also announced the immediate departure of Scherzinger as CEO with Matula serving as interim CEO.

94.     In response to the announcements, UBS and Citi issued reports and lowered their price targets. In reports dated July 25, 2022, UBS noted that while "[m]anagement [said] slower retail traffic patters [were] due to pressured consumption globally, given inflation, high fuel prices and geopolitical uncertainty," it had "previously highlighted risk to revenue CAGR expectations for Weber, after demand pullforward in FY'20 when top line grew +18% and FY'21 when top line grew +30%" compared to "pre-Covid top line CAGR was at +2.3% from '13-'19."

95.     On July 28, 2022, Citi similarly noted that "profitability has been and is expected to remain under greater pressure for some time to come" and "near-term outlook appears weak."

96.     On August 1, 2022, UBS issued another report, further lowering its price target for Weber in part because it "could see top line declining further: Covid pull demand forward" and normalizing revenues would "suggest meaningful declines." UBS explained that "[w]e could see FY'23E a year of further readjustment in demand after sizeable pull-forward of sales that occurred during Covid. . . . We est. over 60% of sales for Weber during Covid (FY'20 and '21) were replacement sales, and in FY'20 over 70% of sales were replacement sales. Weber saw an acceleration of demand in FY'20/21, with top line growing +18% in FY'20 and +30% in FY'21."

97.     In response to Weber's announcements and negative analyst reports, Weber's stock price fell significantly following the July 25, 2022 earnings announcement. From a closing price of $7.51 per share on July 22, 2022 (the trading day immediately prior to July 25, 2022), Weber's stock price fell to $6.56 per share on July 25, 2022. Weber's stock price declined further over the next few days, closing at $6.21 per share on August 1, 2022.

98.     Additional analyst reports over the weeks that followed continued to highlight COVID-19's "pull-forward" effect on Weber. Citi, J.P. Morgan, and UBS all identified the "pull forward" as a risk and/or obstacle to Weber's revenue and earnings. *See*, *e.g.*, *Fiscal 3Q22 Sales In-Line With Preliminary Numbers, But EBITDA Lower Than We Expected*, Citi Research (Aug. 15, 2022); *Running on Fumes; Key Takes*, J.P. Morgan (Aug. 15, 2022); *$75M of EBITDA for 2023; Reiterate Sell*, UBS (Aug. 15, 2022).

99.     The negative impact of the pull-forward demand on Weber's results of operations was reflected in its FY'22 revenue, which dropped 20%, from $1,982.4 million in 2021 to $1,586.5 million in 2022:



100.    Contrary to Weber's representations in the Registration Statement, the surge in revenue during COVID (*i.e.*, fiscal 2020 and 2021) was due to accelerated replacement sales. These replacement sales represented between 60% and 70% of Weber's sales during these years. Historically, replacement sales pre-COVID amounted to only 6.67%.

101.    Weber knew or should have known that replacement sales represented an outsized portion of their revenue during COVID in part due to its internal sales analysis and monitoring

teams, *i.e.*, Weber's "insights team." Replacement sales were keyed off Weber's "replacement cycle" which management described as a 7-year horizon, as discussed in Section IV.B, *supra*. Thus, Weber knew or should have known that the COVID revenue and earnings was not sustainable and disclosed this and related risks to investors accurately.

      2.    <u>BDT Takes Weber Private After the Company's Stock Falls Far Below the IPO Offering Price.</u>

102.    On October 24, 2022, BDT Capital offered to take Weber private.

103.    On December 12, 2022, Weber announced an agreement with BDT Capital to go private at $8.05 per share.

104.    BDT Capital took Weber public for $14 per share in August 2021. If the deal to go private closes during the first half of 2023 as anticipated, BDT Capital will effectively have purchased Weber back at a discount of nearly 50% in the span of just a year and a half.

## V.    <u>MATERIALLY FALSE AND MISLEADING STATEMENTS</u>

105.    The Registration Statement was negligently prepared and, as a result, contained untrue statements of material fact and omitted to disclose material facts that were required to be disclosed pursuant to the regulations governing its preparation.

106.    In pertinent part, the Registration Statement stated that:

> We have experienced growth in various economic environments and have benefited from lasting consumer shifts in behavior towards outdoor cooking, which is evidenced by our 10% revenue CAGR from 1980 to 2021. Our track record of growth is driven by our iconic brand, massive installed base of loyal enthusiasts, and approximately 26% of our revenues being comprised of accessories and consumables all of which support a predictable, recurring revenue model. More recently, our significant investments in Weber Connect, Weber.com, and ***the ongoing consumer shifts towards backyard and outdoor leisure have further enhanced our growth profile. We expect these consumer shifts to continue in the future.***

(emphasis added)

107.    Similarly, the Registration Statement included "key factors" affecting Weber's results of operations, stating in relevant part, "[t]he COVID-19 environment has encouraged consumers to cook at home and enjoy the benefits of outdoor grilling, creating increased demand for our grills and accessories, and *we expect to continue to benefit from these trends even after the pandemic recedes*" (emphasis added).

108.    The statements identified above in ¶¶106-07 were untrue, false and/or materially misleading. While Weber represented that the level and strength of sales it experienced during COVID would continue after the pandemic subsided, it omitted material information that contradicted these representations and conflicted with what a reasonable investor understood the statements to mean. Weber's sales during COVID were elevated due to a "pull-forward" of replacement purchases. These replacement purchases accounted for between 60% and 70% of its sales during COVID, which was materially greater than the 6.67% figure stated elsewhere in the Registration Statement. Consequently, Weber's sales during COVID were not due to "ongoing consumer shifts" or "increased demand" from new "trends" but instead a "pull-forward" of replacement purchases that would not continue post-COVID given Weber's historical (seven-year) replacement cycle. Weber knew (or should have known) but failed to disclose this material information in the Registration Statement and, therefore, also did not expect (or should not have expected) its COVID sales trends to continue as the pandemic "pull-forward" subsided.

109.    The Registration Statement also omitted material information that should have been disclosed in order to make other statements not misleading. Specifically, the Registration Statement stated:

> According to MetrixLab the installed base of U.S. grills is nearly 70 million units representing 56% penetration of U.S. households. We estimate that more than 30 million of these grills are Weber grills, based on MetrixLab, and are being replaced at a rate of over 2 million units per year. While we benefit from growth from our

installed base, our business is not dependent on replacements. We will continue to grow based on the increasing number of first-time grill buyers; consumers purchasing second grills with a different fuel type; heightened demand for specialty grills such as smokers, pellet grills, electric grills and kamado grills; and additional revenue streams including accessories, consumables and grill services. We expect the outdoor cooking market will continue to benefit from increased investment in and around the home as well as macro consumer trends in at home food consumption, culinary exploration and health and wellness.

We believe that several fundamental shifts in consumer behavior are providing positive tailwinds for our industry, including the increasing adoption of outdoor lifestyles and rising focus on health and wellness. More than half (54%) of consumers report cooking more in 2020 and 52% of people cited health as one of their top reasons for cooking at home based on a survey from Hunter PR. The COVID-19 pandemic accelerated certain trends that benefited our industry, and, according to a 2020 survey of grill owners, 85% of grillers globally expect to grill as often or more often after the pandemic than they did before the pandemic. We believe that the grill represents the center of any outdoor lifestyle and ***our industry will see continued resiliency through the business cycle and growth driven by increasing demand for outdoor spaces.***

(emphasis added)

110.    The statements identified above in ¶¶109 were untrue, false and/or materially misleading. While Weber told investors that COVID had "accelerated certain trends" and cited a "2020 survey of grill owners" when representing it would have "continued resiliency" and "growth" in its business, the company's sales during COVID were elevated due to a "pull-forward" of replacement purchases that accounted for between 60% and 70% of its sales. The rate of replacement purchases during COVID was materially different than the 6.67% figure provided to investors in the above excerpt (*i.e.*, 2 million out of 30 million Weber grills). Thus, Weber's replacement purchases accounted for an outsized and irregular portion of its overall sales at the time of the IPO and, consequently, its strong sales during COVID were not being driven by improved industry trends or demand. This information materially contradicted the above statements. By omitting it, the above statements from the Registration Statement were rendered false and/or materially misleading.

111.    The "Risk Factors" included in the Registration Statement were also false and/or materially misleading. In pertinent part, the Registration Statement stated:

> Challenges in forecasting demand, which we have encountered during the COVID-19 pandemic, can also make it difficult to estimate future results of operations and financial condition from period to period. ***A failure to accurately predict the level of demand for our products*** or manage product inventory in an effective and efficient manner could adversely impact our profitability or ***cause us not to achieve our expected financial results***.

(emphasis added)

112.    The Registration Statement also stated:

> The COVID-19 pandemic caused a sustained global economic slowdown of varying durations across different industries, and it is possible that it could still cause a global recession. Deteriorating economic and political conditions caused by the COVID-19 pandemic, such as increased unemployment, decreased capital spending, declines in consumer confidence, or economic slowdowns or recessions, could cause a decrease in demand for our products. In addition, a prolonged or worsened COVID-19 pandemic could lead to the shutdown or material reduction of grill manufacturing, repair and replacement as well as a reduction in residential construction and remodeling activity, which could have a material adverse effect on our business, financial condition, results of operations and cash flows. ***While we have experienced higher demand in our grill business as consumers sheltered in place and have spent more time at home as a result of the COVID-19 pandemic, such growth may not be sustainable and may not be repeated in future periods.*** Furthermore, even if growth in demand continues, we may not be able to meet that demand due to production and capacity challenges.

(emphasis added)

113.    The statements identified above in ¶¶111-12 were untrue, false and/or materially misleading. In both instances, Weber cautioned investors about the level of demand it had experienced during COVID while, at the same time, failing to disclose that the demand had been elevated due to a "pull-forward" of replacement purchases that accounted for between 60% and 70% of its sales. Thus, the above statements omitted material information concerning risks that had already materialized. Instead of disclosing that Weber knew at the time of the IPO that its replacement purchases accounted for an outsized portion of its overall sales and that sales at these

levels would not continue post-COVID due to its historical sales cycle, the Registration Statement merely warned that it could or might face difficulty predicting or realizing demand in future quarters.

## VI.      FAILURE TO COMPLY WITH SEC RULES AND REGULATIONS

114.     The Registration Statement failed to identify and disclose known trends, events, demands, commitments, and uncertainties that were then having and were reasonably likely to have a material effect on Weber's operating performance.

115.     Item 303 of SEC Regulation S-K, 17 C.F.R. § 229.303(b)(2)(ii) ("Item 303"), required Defendants to "[d]escribe any known trends or uncertainties that have had or that [the registrant] reasonably [expects will] have a material favorable or unfavorable impact on the sales or revenues or income from continuing operations."

116.     During COVID, Weber experienced elevated sales from the pandemic "pull-forward" trend. These sales represented a "pull-forward" of replacement purchases that accounted for between 60% and 70% of Weber's sales instead of the 6.67% replacement purchase figure provided in the Registration Statement. The elevated level of replacement purchases represented a trend that was likely to (and, in fact, did) have a negative impact on Weber's sales, revenues, and income once COVID subsided. Pursuant to Item 303, the Registration Statement was required to "describe" both the trend and the impact it would have on operations. The Registration Statement failed to do this and, consequently, violated Item 303.

117.     Similarly, Item 105 of Regulation S-K, 17 C.F.R. § 229.105 ("Item 105"), required in the "Risk Factors" section of registration statements and prospectuses "a discussion of the [most significant] factors that make [the offering] . . . speculative or risky" and requires each risk factor to "adequately describe[] the risk."

34

118.    As described above, Weber experienced elevated sales from the pandemic "pull-forward" trend which was likely to impact operations negatively in future periods once replacement purchases returned to normal levels as COVID subsided. Given that Weber conducted its IPO in the midst of the pandemic, the risks associated with the "pull-forward" trend were highly material. However, the Registration Statement did not discuss these risks, including the negative impacts that the "pull-forward" trend would have on Weber's earnings. Consequently, the Registration Statement violated Item 105.

## VII.    INAPPLICABILITY OF THE PSLRA SAFE HARBOR AND BESPEAKS CAUTION DOCTRINE

119.    The statutory safe harbor and/or bespeaks caution doctrine applicable to forward-looking statements under certain circumstances does not apply to any of the allegedly false and misleading statements pleaded in this Complaint. First, the PSLRA safe harbor for forward-looking statements does not apply to statements made in the IPO. 15 U.S.C. § 77z-2(b)(2)(D). Second, the bespeaks caution doctrine does not apply because the statements alleged to be false and misleading herein all relate to then-existing facts and conditions. In addition, to the extent certain of the statements alleged to be false may be characterized as forward-looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

120.    Weber's cautionary statements also failed to identify and/or disclose the omitted facts alleged herein. The Registration Statement did not disclose that Weber's heightened sales during COVID were due to a "pull-forward" of replacement purchases and/or the impact that these "pull-forward" sales would have on revenue and earnings. These "pull-forward" sales had already occurred at the time of the IPO. Thus, these risks were known or knowable to Defendants but not

disclosed. For this reason, the bespeaks caution doctrine does not apply and/or is not applicable as a defense in this action.

## VIII.   CLASS ACTION ALLEGATIONS

121.   Plaintiff brings this action as a class action pursuant to Federal Rules of Civil Procedure 23(a) and (b)(3) on behalf of a class, consisting of all persons and entities that purchased or otherwise acquired Weber's Class A common stock pursuant or traceable to the false Registration Statement issued in connection with the IPO, and were damaged thereby (the "Class"). Excluded from the Class are Defendants, the officers and directors of Weber, at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

122.   The members of the Class are so numerous that joinder of all members is impracticable. Each of the relevant securities were actively traded on the NYSE under the symbol "WEBR." While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are at least hundreds, if not thousands, of members in the proposed Class. Weber sold approximately 17.9 million shares of Class A common stock in connection with the IPO. Moreover, record owners and other members of the Class may be identified from records maintained by Weber or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

123.   Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class were similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

124.   Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

125.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a)     whether the Defendants violated the Securities Act as alleged herein;

(b)     whether the Registration Statement issued by Defendants to the investing public misrepresented material facts or omitted material facts necessary not to make the statements about Weber's business, operations, or prospects misleading; and

(c)     the extent to which the members of the Class have sustained damages and the proper measure of damages.

126.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, since the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## COUNT I

**Violation of Section 11 of the Securities Act**
**(Against Weber, the Individual Defendants, and the Underwriter Defendants)**

127.     Plaintiff repeats and realleges each and every allegation contained above. Plaintiff specifically disclaims any allegations that are based on fraud, recklessness, or intentional misconduct.

128.    This count is brought pursuant to Section 11 of the Securities Act, 15 U.S.C. §77k, on behalf of Plaintiff and other members of the Class, against Weber, the Individual Defendants, and the Underwriter Defendants.

129.    The Registration Statement was inaccurate and misleading, contained untrue statements of material facts, omitted facts necessary to make the statements made therein not misleading, and omitted to state material facts required to be stated therein.

130.    Weber is the issuer of the securities purchased by Plaintiff and other members of the Class. As such, Weber is strictly liable for the materially untrue statements contained in the Registration Statement and the failure of the Registration Statement to be complete and accurate.

131.    The Individual Defendants each signed the Registration Statement. As such, each is strictly liable for the materially inaccurate statements contained therein and the failure of the Registration Statement to be complete and accurate. The Individual Defendants named herein were responsible for the contents and dissemination of the Registration Statement, which were inaccurate and misleading, contained untrue statements of material facts, omitted facts necessary to make the statements made therein not misleading, and omitted to state material facts required to be stated therein. The Individual Defendants each had a duty to make a reasonable and diligent investigation of the truthfulness and accuracy of the statements contained in the Registration Statement and ensure that they were true and accurate and not misleading. In the exercise of reasonable care, the Individual Defendants should have known of the material misstatements and omissions contained in the Registration Statement. Accordingly, the Individual Defendants are liable to Plaintiff and the other members of the Class.

132.    The Underwriter Defendants were each Underwriters, as that term is used in Section 11(a)(5) of the Securities Act, with respect to the IPO and Weber's Class A stock sold through the

Registration Statement. The Underwriter Defendants were required to investigate with due diligence the representations contained therein to confirm that they did not contain materially misleading statements or omit material facts. None of the Underwriter Defendants made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statement were true, were without omission of any material facts, and/or were not misleading.

133.    By reason of the conduct alleged herein, each Coinbase and the Individual Defendants violated Section 11 of the Securities Act.

134.    Plaintiff and the other members of the Class acquired Coinbase common stock pursuant or traceable to the Registration Statement and without knowledge of the untruths and/or omissions alleged herein. Plaintiff and the other members of the Class sustained damages, and the price of Coinbase's shares declined substantially due to material misstatements in the Registration Statement.

135.    This claim was brought within one year after the discovery of the untrue statements and omissions and within three years of the date of the Direct Listing.

136.    By virtue of the foregoing, Plaintiff and the other members of the Class are entitled to damages under Section 11, as measured by the provisions of Section 11(e), from the Defendants and each of them, jointly and severally.

## COUNT II

### Violation of Section 15 of the Securities Act
### (Against the Individual Defendants and BDT Capital)

137.    Plaintiff repeats and realleges each and every allegation contained above. Plaintiff specifically disclaims any allegations that are based on fraud, recklessness, or intentional misconduct.

138. This Count is brought by Plaintiff against the Individual Defendants and Defendant BDT pursuant to Section 15 of the Securities Act, 15 U.S.C. § 77o, on behalf of the Class.

139. This Count is asserted against the Individual Defendants and Defendant BDT, each of whom possessed the power to control, and did control, directly and/or indirectly, the action of Weber at all relevant times.

140. The Individual Defendants and Defendant BDT were each control persons of Weber by virtue of their positions as directors, senior officers, and/or authorized representatives of Weber. The Individual Defendants and Defendant BDT had the power and authority to control the contents of Weber's Registration Statement and had the ability and opportunity to prevent their issuance or cause them to be corrected. The Individual Defendants and Defendant BDT each had a series of direct and/or indirect business and/or personal relationships with other directors and/or officers and/or major shareholders of Weber. Further, after the IPO, Weber was considered a "controlled company" within the meaning of the listing rules of the NYSE because Defendant BDT had more than 50% of the voting power for the election of directors of Weber's Board.

141. As a direct and proximate result of said wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their purchase or acquisition of Weber Class A common stock.

142. This claim is brought within the applicable statute of limitations.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

A. Declaring this action to be a proper class action under Rule 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure, certifying Plaintiff as Class Representative and Lead Counsel as Class Counsel;

B.      Awarding damages in favor of Plaintiff and the Class against all Defendants, jointly and severally, in an amount to be proven at trial, including pre-judgment and post-judgment interest thereon;

C.      Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including and attorneys' fees and expert fees, and other costs and disbursements; and

D.      Awarding Plaintiff and the Class such other and further relief, including any injunctive or other equitable relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated: February 27, 2023                    Respectfully submitted,

**LUBIN AUSTERMUEHLE, P.C.**

 s/ Peter S. Lubin
Peter S. Lubin
Patrick D. Austermuehle
Lubin Austermuehle, P.C.
17W220 22nd Street, Suite 410
Oakbrook Terrace, IL 60181
Tel: (630) 333-0333
peter@l-a.law
patrick@l-a.law

*Liaison Counsel for Plaintiff*

**LEVI & KORSINSKY, LLP**
Adam M. Apton (*pro hac vice* submitted)
Devyn R. Glass (*pro hac vice* forthcoming)
55 Broadway, 10th Floor
New York, N.Y. 10006
Tel.: (212) 363-7500
aapton@zlk.com
dglass@zlk.com

*Lead Counsel for Plaintiff and the Class*